# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

Gail Downing,                              )
                                           )      **Case No. 3:22-cv-00447**
      **Plaintiff,**                  )
                                           )      **JUDGE CAMPBELL**
**v.**                                     )      **MAGISTRATE JUDGE**
                                           )      **HOLMES**
**AstraZeneca Pharmaceuticals LP,**        )
                                           )      **JURY DEMAND**
      **Defendant.**                  )

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Plaintiff Gail Downing ("Plaintiff") brings this action against AstraZeneca Pharmaceuticals LP ("AstraZeneca") for alleged age discrimination under the Age Discrimination in Employment Act of 1976 ("ADEA") and the Tennessee Human Rights Act, §4-21-101, *et seq.*, and violation of the Tennessee Public Protection Act ("TPPA").[1] As discussed more fully below, and as set forth in the accompanying Statement of Undisputed Facts ("SUMF"), there is no genuine issue of material fact regarding Plaintiff's claims.

AstraZeneca terminated Plaintiff's employment as Executive District Sales Manager after it substantiated through text message and email evidence, as well as employee interviews, that she had asked sales representatives on her team to obtain Bydureon samples ("BCISE") for her personal use in direct violation of Company policy. AstraZeneca also substantiated that Plaintiff breached confidentiality during an HR investigation, showed her breast to a subordinate, and discouraged an employee from reporting potential concerns to HR. There is no legal or factual basis to support Plaintiff's claim that AstraZeneca terminated her **because of** her age or **solely** for refusing to remain silent about illegal activities. Plaintiff simply cannot present competent record

---

[1] The Court granted Defendant's Motion to Dismiss Plaintiff's Title VII and statutory and common law retaliation claims on July 20, 2023. This motion will focus on Plaintiff's remaining claims.

evidence that contradicts the core facts put forward by AstraZeneca as to the legitimate reasons for terminating her employment. AstraZeneca's investigation was beyond reproach and certainly supports the decision to terminate Plaintiff's employment. Moreover, the law is clear that courts will not sit as super-personnel departments to second guess an employer's business decision.

Accordingly, for all of these reasons, as well as those set forth in more detail below, AstraZeneca respectfully requests that this Court grant its Motion for Summary Judgment.

## STATEMENT OF UNDISPUTED MATERIAL FACTS[2]

Plaintiff is a female who was born on October 10, 1958 (age 65). Statement of Undisputed Material Facts ("SOF") ¶ 1. Plaintiff began working for AstraZeneca, a multinational pharmaceutical company, on February 1, 2014, after AstraZeneca purchased Plaintiff's prior employer, Bristol Myers Squibb. SOF ¶ 2. At that time, Plaintiff was a senior manager. SOF ¶ AstraZeneca subsequently promoted Plaintiff to the role of Executive District Sales Manager when she was approximately 57 years old. SOF ¶ 4. Plaintiff reported to Francis Bellefeuille, Sr. Commercial Business Director. SOF ¶ 5.

As Executive District Manager, Plaintiff directly supervised the Specialty Care Sales Representatives (also known as Pharmaceutical Sales Specialists or PSSs) and was tasked with delivering sales results across the state of Tennessee and parts of North Carolina and Kentucky. SOF ¶ 6. Plaintiff managed the diabetic portfolio, and the sales representatives on her team sold Farxiga, Bydureon (BCISE), and Xigduo products. SOF ¶ 7.

At the time of her termination, Plaintiff supervised ten PSSs throughout Tennessee and western North Carolina – Danny (Brice) Roberts, David Jones, Emily Bauguss, Jennifer Page,

[2] The facts presented herein are based on Plaintiff's version of events. AstraZeneca accepts these facts as true solely for the purpose of its Motion for Summary Judgment, and AstraZeneca reserves the right to present different or additional facts at a trial of this matter.

2

Mike Tucker, Montego Jackson, Ronda Faull, Sharon McGraw, Stacey Colvin, and Toby Crowden. SOF ¶ 8. Plaintiff worked with several representatives on her team for years, including Roberts for five years; Page for six years; McGraw for fifteen years; and Colvin for twenty years. SOF ¶ 9. As a result, the Nashville team (including Plaintiff, Roberts, Page, Colvin, and sometimes McGraw when she filled in) became very close and socialized outside of work. SOF ¶ 10. In addition, Plaintiff hosted annual pool parties for her entire team at her home where she served alcohol and provided a courtesy shuttle to their hotel. SOF ¶ 11. Because North Carolina representatives Bauguss and Jones worked under Plaintiff's supervision for less than one year, they did not have the opportunity to attend any of Plaintiff's pool parties. SOF ¶ 12.

AstraZeneca maintains a policy handbook that sets forth the Company's compliance principles, including those concerning the proper handling of product samples and the prohibition on taking samples for personal use. SOF ¶ 13. The policy states that employees must not "knowingly give samples to health care professionals ("HCPs") for personal use (including for their family and friends) or take them for personal use." SOF ¶ 14. While PSSs receive an allocation of samples every month, PSSs do not carry physical samples on their person – rather, AstraZeneca allocates samples to PSSs electronically, and when a PSS desires to provide an HCP with a sample, the PSS notes this electronically and samples are mailed directly to the HCP's offices. SOF ¶ 15. If a PSS needs additional samples, his or her District Manager can electronically reallocate samples to that PSS from another PSS. SOF ¶ 16. The District Manager does not have an allocation of samples to give to HCPs, and the District Manager can only reallocate samples electronically. SOF ¶ 17.

In addition, AstraZeneca maintains a Prescription Drug Sample Manual, which indicates that AstraZeneca samples become the property of the HCP upon delivery and may only be

3

dispensed to a patient under an HCP's supervision. SOF ¶ 18.

## I.     HR Investigation Into Alleged Misconduct By Jennifer Page

AstraZeneca encourages employees to report any potential policy violations, and retaliation against anyone for reporting or cooperating in investigations is strictly prohibited. SOF ¶ 19.  On June 7, 2021, Plaintiff emailed Kelly Antonietti in Human Resources to report potential misconduct by Page, who was out on short-term disability. SOF ¶ 20.  Specifically, Plaintiff informed Ms. Antonietti that in late May 2021, she received a phone call from McGraw who told her that HCP Brandy Biederman notified McGraw that Page had shared an inappropriate photograph of a teenager's genitals and Page acknowledged having some relationship with him. SOF ¶ 21.  Plaintiff also reported that according to McGraw, Page had an argument with another HCP, Dr. Carlson, prior to going out on leave. SOF ¶ 22. After speaking with McGraw, Plaintiff called Bellefeuille to inform him what McGraw said and Bellefeuille directed Plaintiff to contact HR. SOF ¶ 23.

AstraZeneca promptly initiated an investigation into the allegations against Page. SOF ¶ 24.  Kimberly Barrow, AstraZeneca's US Sexual Harassment and Bullying Investigations Lead, led the investigation into the allegations regarding Page. SOF ¶ 25.  As part of her investigation, Barrow interviewed McGraw, Plaintiff, Roberts, and Colvin. SOF ¶ 26.  Barrow also interviewed Page upon her return to work from disability leave. SOF ¶ 27. In September of 2021, while Barrow was concluding her investigation, Plaintiff informed Barrow that Page had made inappropriate comments to Roberts concerning his genitals and to McGraw concerning a bikini wax. SOF ¶ 28. As a result, Barrow interviewed McGraw, Plaintiff, Roberts, Colvin, and Page again concerning these new allegations. SOF ¶ 29.

At the conclusion of the investigation, Barrow determined that Page told some individuals

4

that a teenager sent her a photograph of his genitals; however, Barrow was not able to substantiate that Page shared this photograph with Biederman. SOF ¶ 30. When Barrow interviewed McGraw, she told Barrow that Biederman did not tell her Page showed her a photograph. SOF ¶ 31. McGraw said Biederman told her Page referenced receiving a photograph from a younger guy. SOF ¶ 32. Biederman reached out to District Sales Manager Kelly Covington to seek advice regarding the information Page had shared with Biederman. SOF ¶ 33. Covington spoke with Biederman about her conversation with Page. SOF ¶ 34. Covington told Barrow that Biederman told her the following: Page did not show Biederman any photographs. Rather, Page told Biederman her husband found a photograph on her phone, and he became angry with Page. SOF ¶ 35. Plaintiff testified that Plaintiff did not see the photograph and no one on the team told Plaintiff they saw the photograph. SOF ¶ 36.

AstraZeneca was unable to substantiate that Page had a confrontation with Dr. Carlson after Dr. Carlson confirmed through emails that there was no disturbance or inappropriate behavior by Page. SOF ¶ 37. It was substantiated that Page made inappropriate comments to Roberts as part of banter/joking with the team, but unsubstantiated that Page made inappropriate comments about a bikini wax. SOF ¶ 38. Barrow authored an HR Investigation Final Report memorializing her findings. SOF ¶ 39.

## II. Compliance and HR Investigations Into Allegations Against Plaintiff

On or about September 29, 2021, during Barrow's second interview with Page, Page reported numerous instances of misconduct allegedly committed by Plaintiff. SOF ¶ 40. Page reported that Plaintiff asked her team to bring her BCISE samples; falsified field coaching reports; encouraged the team to use her son's bakery, which would be a conflict of interest; breached confidentiality during an open HR investigation; provided a marijuana gummy to Colvin; showed

5

Page her breast; and discouraged Emily Bauguss from reporting any concerns to HR. SOF ¶ 41.

AstraZeneca promptly initiated an investigation into the allegations against Plaintiff. SOF ¶ 42. Michael Pomponi, Associate Director, Governance, took the lead in investigating the alleged compliance violations (BCISE samples, field coaching report falsification, and conflict of interest regarding Plaintiff's son's bakery), while Joshua Davis, Senior Employee Relations Partner, led the investigation into the alleged HR violations (breach of confidentiality, marijuana gummy, showing of Plaintiff's breast, and discouraging comments regarding HR reporting). SOF ¶ 43. Pomponi and/or Davis interviewed Page and Downing twice, and they also interviewed Roberts, Colvin, McGraw, Bauguss, Montego Jackson, and Alan Florence. SOF ¶ 44.

## A. AstraZeneca Substantiated That Plaintiff Asked Her Team to Bring Her BCISE Samples for Personal Use.

Page informed Pomponi that Plaintiff asked her and other PSSs on the team to get BCISE samples for her. SOF ¶ 45. Page provided Pomponi with a text on her phone dated January 19, 2021, from Plaintiff to Page, Colvin and Roberts asking "can one of you or all of you please bring me some Bcise? Am down to my last one." SOF ¶ 46. The text concluded with a smiley face emoji. SOF ¶ 47. Page stated that based on Plaintiff's request, she asked one of her providers, Stacy Brown, FNP, if she could take a BCISE sample from the office, and that after receiving the provider's permission, Page gave the sample to Plaintiff. SOF ¶ 48. When Pomponi questioned Plaintiff about the "bring me some Bcise" text during the investigation, Plaintiff stated the text referred to reallocating samples. SOF ¶ 49. However, the reallocation of samples would have been completed electronically in Sample Central – there is never a physical reallocation of samples, and the wording of the text ("bring me") strongly suggests that it is referring to physical samples. SOF ¶ 50. Plaintiff could not explain why the text was worded this way and admitted it looks like she is asking the PSSs to bring her a physical sample. SOF ¶ 51.

6

Pomponi also conducted a review of electronic documents, which revealed two emails confirming that Plaintiff and an external party were discussing BCISE samples. SOF ¶ 52. Plaintiff received an email on November 21, 2020, at 8:43 AM from Jill Boyle, a friend of Plaintiff's who is a physician, stating, "I took the Bydureon a few minutes ago. Very easy to do. Crossing fingers that I tolerate it well and will let you know. If I experience less nausea that I have with Victoza, perhaps a second free sample before I ask for a script from my doctor?" SOF ¶ 53. On November 21, 2020, at 2:59 PM Downing responded, "I can easily give you 2-3 more BCISE to get you on your way to steady state and really think that you will tolerate it much better, hope so." SOF ¶ 54. Downing received another email from Boyle on November 22, 2020 at 8:49 AM stating, "Thank you again for the free sample. So Far I feel fine – not hungry this morning and barely any queasiness if at all." SOF ¶ 55.

Pomponi and Davis interviewed Plaintiff on November 30, 2021, via Microsoft Teams. SOF ¶ 56. Plaintiff explicitly stated that she was parked in her car during this interview. SOF ¶ 57. When Pomponi asked Plaintiff about the Jill Boyle emails, Plaintiff hemmed and hawed, and finally stated that her friend got a BCISE prescription from Plaintiff's husband, a retired anesthesiologist, and the free sample was a thirty-day free trial that Plaintiff gave to her, even though Boyle stated in the November 21, 2020 email, "perhaps a second free sample before I ask for a script from my doctor?".[3] SOF ¶ 58. Downing then stated, "I did not talk to Boyle's endocrinologist. She must have got the sample from her provider. Maybe she asked her provider." SOF ¶ 59.

When asked why her friend was asking for another free trial before asking for a script from her doctor, Plaintiff's audio changed to "mute". SOF ¶ 60. Pomponi messaged Plaintiff through

---

[3] Pomponi pulled sample data for Plaintiff's husband, and he had not provided any samples between January 2018 and November 2020. *See* Pomponi Decl. ¶ 21.

Teams asking her to rejoin the call, and he attempted to call Plaintiff's cell phone twice, and both times the calls went directly to voicemail. SOF ¶ 61. *Over one hour and thirty minutes later*, Plaintiff rejoined the call, claiming she lost reception due to driving, despite the fact that Plaintiff had not been driving when the call disconnected. SOF ¶ 62. Plaintiff stated that during the break, she was able to call her friend to discuss the emails. SOF ¶ 63. Plaintiff provided a different explanation for the emails with Boyle – Plaintiff said she had called Boyle's endocrinologist's office and asked the nurse to give Boyle a BCISE sample after Boyle complained of nausea after taking Victoza. SOF ¶ 64. This statement contradicted Plaintiff's earlier statement that she had not contacted Boyle's endocrinologist, and it was also non-sensical. SOF ¶ 65. It would be highly unusual and a violation of AstraZeneca policy for a District Manager to entangle his or herself with an HCP's provision of samples to a specific patient. SOF ¶ 66. Pomponi and Davis determined that Plaintiff was not honest during her interview based on her changing story, the inexplicable disconnection of the interview, and her demeanor during the interview. SOF ¶ 67.

Based on the text message, emails, and interviews, Pomponi substantiated that Plaintiff obtained BCISE for personal use in violation of AstraZeneca policy. SOF ¶ 68. Pomponi was unable to substantiate the remaining allegations regarding alleged compliance violations. SOF ¶ 69.

**B. AstraZeneca Substantiated That Plaintiff Committed HR Violations.**

Page alleged that while she was out on short-term disability leave, Roberts called her to tell her that AstraZeneca was opening an HR investigation into whether she showed a photograph of a teen's genitalia to an HCP. SOF ¶ 70. The implication was that Roberts must have obtained this information from Plaintiff. SOF ¶ 71. During the investigation, Roberts denied that Plaintiff informed him of the investigation of Page, and that instead, McGraw was the individual who

8

informed him about the investigation. SOF ¶ 72. However, McGraw denied ever speaking to Roberts regarding what the HCP shared. SOF ¶ 73. Plaintiff confirmed she informed Roberts, Colvin, and McGraw that HR would be contacting them regarding an investigation, but denied she provided any specifics regarding the investigation. SOF ¶ 74.

Based on text and email evidence, Davis determined that Plaintiff had far more casual and frequent conversations with Roberts compared to the rest of the team and therefore it was far more likely that Plaintiff informed Roberts of the investigation than McGraw. SOF ¶ 75. Based on a credibility assessment, the aforementioned relationships between the individuals who were interviewed, and the fact that Plaintiff admitted she had a conversation with Roberts, Colvin, and McGrath regarding the investigation, Davis substantiated that Plaintiff breached confidentiality during an HR Investigation. SOF ¶ 76.

In addition, Plaintiff admitted to showing her breast to Page; as such, this allegation was substantiated. SOF ¶ 77.

Finally, Davis determined that Plaintiff discouraged Bauguss from reporting potential concerns to HR. SOF ¶ 78. Bauguss confirmed that Plaintiff had a conversation with her leading up to one of the scheduled pool parties at Plaintiff's house. SOF ¶ 79. Plaintiff admitted to speaking with Bauguss about building trust with the team. SOF ¶ 80. Bauguss testified that on January 27, 2021, Plaintiff told Bauguss someone in the district asked if Plaintiff planned on inviting Bauguss to the annual district pool party because this person was concerned Bauguss would go to HR. SOF ¶ 81. Bauguss testified that Plaintiff then told Bauguss that she had a reputation for being compliant. SOF ¶ 82. Davis concluded the purpose of this discussion was to dissuade Bauguss from reporting conduct at the pool party to HR. SOF ¶ 83.

Davis was unable to substantiate the allegation that Plaintiff provided a marijuana gummy

to Colvin. SOF ¶ 84.

## C. <u>Discipline Issued As A Result of the HR and Compliance Investigations</u>

Davis recommended a Written Warning for Plaintiff as a result of the HR investigation and substantiated violations of AstraZeneca's Code of Ethics—Standards of Conduct. SOF ¶ 85. However, once Pomponi completed his investigation and determined Plaintiff had asked members of her team to obtain BCISE for personal use in violation of AstraZeneca's compliance policies, Pomponi presented his findings to Bellefeuille and recommended termination of Plaintiff's employment as the appropriate disciplinary sanction. SOF ¶¶ 86, 87.

Bellefeuille agreed that termination was warranted due to the significance of the substantiated compliance violation, namely violating the US Policy Handbook and Prescription Drug Sample Manual by asking her team to obtain samples for her personal use and that of a friend, coupled with the substantiated HR violations. SOF ¶ 88.

AstraZeneca issued Page a Written Warning. SOF ¶ 89. AstraZeneca found that Page violated the handbook and Drug Sample Manual for admitting to obtaining BCISE to provide to Plaintiff for personal use. SOF ¶ 90. However, AstraZeneca found that Page acted at the direction of her supervisor, and she spoke candidly about doing so during the investigation, in contrast to Plaintiff. SOF ¶ 91. Page was also disciplined for telling others that a teenager sent a photograph of his genitals and making inappropriate comments to Roberts. SOF ¶ 92.

## LAW AND ARGUMENT

Plaintiff initiated this lawsuit because she is angry that she lost her job, and her subordinate, Page, who she believes committed a worse infraction, did not. Plaintiff believes that Page reported her violations of Company policy to AstraZeneca in retaliation for Plaintiff reporting Page.

Plaintiff believes that had she not reported Page, that Page would not have reported her, and she would still be employed.  Plaintiff feels that Page wronged her and is the reason for her termination.

However, Plaintiff cannot state a legally cognizable claim against Page; as such, she has manufactured claims against AstraZeneca. Plaintiff tried to sue AstraZeneca for retaliation under Title VII of the Civil Rights Act of 1964, as amended, as well as common law retaliation; however, the Court dismissed these claims.  As such, Plaintiff has attempted to shoehorn claims against AstraZeneca for age discrimination under federal and state law and violation of the TPPA.  As set forth herein, these claims fail.

A. **Plaintiff's Age Discrimination Claims Fail as a Matter of Law**

   1. **Plaintiff Cannot State a Prima Facie Case**

"The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.,* 147 L. Ed. 2d 105 (2000).  Under the ADEA and the THRA[4] specifically, an employer is prohibited from taking adverse employment actions against an individual "**because of** such individual's age." 29 U.S.C. § 623(a)(1) (2012) (emphasis added). Unlike a Title VII discrimination plaintiff, an ADEA plaintiff cannot prove her case by establishing that age was simply a "motivating factor"; instead, the plaintiff has "the burden of persuasion to establish that age was the **'but-for'** cause of the employer's adverse action." *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 177 (2009) (emphasis added). "Under Gross, satisfying but-for cause requires plaintiffs to show that age '**had a determinative influence on the outcome'** of the employer's decision-making process." *Pelcha v. MW Bancorp, Inc*., 988 F.3d 318, 324 (6th Cir. 2021)

---

[4] Federal courts assess age-based claims under the THRA using the same analytical framework as ADEA claims. *Pierson v. Quad/Graphics Printing Corp*., 749 F.3d 530, 536 (6th Cir. 2014); *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 620 (6th Cir. 2006).

(quoting *Gross*, 557 U.S. at 176) (emphasis added).

In analyzing ADEA claims on summary judgment, the plaintiff is required to proffer evidence of a prima facie case that: (1) the plaintiff was at least 40 years of age; (2) he or she was discharged; (3) he or she was qualified for the position; and (4) he or she was replaced by a younger individual. *Skalka v. Fernald Environment Restoration Mgt. Corp.*, 178 F.3d 414, 420 (6th Cir. 1999). "The fourth element may be satisfied by showing that "similarly situated non-protected employees were treated more favorably."" *Tuttle v. Metropolitan Government of Nashville,* 474 F.3d 307, 317 (6th Cir. 2007).

Plaintiff's claim fails because she cannot present any admissible evidence regarding the fourth prong of a prima facie case—that she was replaced by someone outside of her protected class or that she was treated less favorably than a similarly situated individual outside of her protected class.

AstraZeneca anticipates that Plaintiff will attempt to support her claims against AstraZeneca by pointing to Page, who was not terminated after she admitted to taking BCISE samples. However, Page is not a comparator to Plaintiff. "[T]o be deemed 'similarly-situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it". *Novotny v. Reed Elsevier,* 291 Fed. Appx. 698, 703-704 (6th Cir. 2008) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

Plaintiff's purported comparator (Page) is dissimilar to her in many material ways, including differences in job title and responsibility (Executive DSM versus Sr. Exec. PSS roles), reporting hierarchy (Page reported to Plaintiff while Plaintiff reported to Francis Bellefeuille),

candor during the investigation interviews, and the nature of the other infractions committed.[5] *See* Exh. 1 to Pl.'s Dep; Pomponi Decl. ¶¶ 30, 38; Exh. 2 to Davis Dep; Exh 15 to Barrow Dep.

Plaintiff was an Executive DSM and Page's supervisor. Exh. 1 to Pl.'s Dep.; Pl.'s Dep. p. 31. Her elevated role imposed upon her a greater level of responsibility than that of Page, and she abused it by not only obtaining BCISE for her own personal use, but by also asking her subordinates to obtain the samples for her. Exh. 1 to Pl.'s Dep.; Pomponi Decl. ¶¶ 9, 10, 37. It is undisputed that Page only took the BCISE sample at Plaintiff's direction. *See* Pomponi Dep. p. 86; Pomponi Decl. ¶ 37.

Regarding candor during the investigation, Page not only acknowledged that she took a BCISE sample, she volunteered this information to AstraZeneca. Pomponi Decl. ¶¶ 8, 37-38. That Page would implicate herself in wrongdoing bolstered Page's credibility in Pomponi's view; she would have absolutely no reason to fabricate a story that would certainly result in disciplinary action. *Id.* ¶¶ 8; 36.

On the other hand, Plaintiff changed her story multiple times during her interview with Pomponi and Davis when attempting to explain the text message and emails relating to BCISE samples, she dropped off the call when faced with critical, previously undisclosed information, and her final explanation was non-sensical. *Id.* ¶¶ 8, 12-30. Pomponi and Davis—whose job duties routinely include assessing credibility—found Plaintiff to be untruthful. *Id.* ¶ 8, 30. There is no allegation that Pomponi or Davis bore any animus toward Plaintiff for any reason, including her age or because she reported alleged illegal activity. *Id.* ¶ 40. In fact, there is no evidence that

---

[5] Plaintiff also showed her breast to a subordinate (Page), and discouraged a new employee who reported to her from bringing issues to HR. See Exh. 2 to Davis Dep. Page did not show her breast to anyone at work nor discourage others from taking issues to HR. Page was found to have made inappropriate comments to her coworker (who she was friends with and regularly joked and bantered with) and told a provider that a teenager sent her an inappropriate photograph. See Exh. 15 to Barrow Dep.

13

anyone at AstraZeneca, including Bellefeuille, the decisionmaker regarding Plaintiff's termination, bore any animus toward Plaintiff because of her age. Pl.'s Dep. p. 175. Plaintiff cannot show that Page was similarly situated to her; as such, she cannot state a prima facie case of age discrimination.

### 2. AstraZeneca terminated Plaintiff's employment for a legitimate, non-discriminatory reason, and Plaintiff cannot show pretext

Here, even assuming *arguendo* Plaintiff can make out prima facie case (which she cannot), Plaintiff cannot establish that AstraZeneca's legitimate, non-discriminatory reason for the adverse employment action—obtaining BCISE for personal use or to give to someone else—is pretextual, nor can she prove that she would not have been terminated "but for" her age. In order to demonstrate pretext, Plaintiff must show "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

"[A] reason cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Hamby v. Williams*, 2021 U.S. Dist. LEXIS 211622, *20-21 (E.D.Tenn. 2021) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) (emphasis in original). "[T]he plaintiff must put forth evidence which demonstrates that the employer did not honestly believe in the proffered non-discriminatory reason for its adverse employment action." *Id.* (quoting *Hodges v. City of Milford*, 918 F. Supp. 2d 721, 739 (S.D. Ohio 2013) (citing *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001))).

Plaintiff cannot make this showing. The undisputed facts demonstrate that AstraZeneca conducted two extensive investigations which substantiated the allegations against Plaintiff. *See*

14

Pomponi Decl. ¶¶ 5-8, 31; Exh. 2 to Davis' Deposition. The investigations included numerous interviews and review of text messages and emails sent by Plaintiff. *Id.* ¶¶ 7-10, 15. There is absolutely no evidence that Plaintiff's significant compliance and policy violations did not motivate the termination decision.

Further, when asked why she believes her age played a role in her termination, Plaintiff stated that she thought it was because she was a highly compensated individual and because AstraZeneca chose to believe Page instead of her. These reasons do not show pretext. First, the law is clear that wage does not equal age when assessing discriminatory intent—while many higher wage earners are often older, income is not a proxy for age. *See Acree v. Tyson Bearing Co.,* 128 F. App'x 419, 428 (6th Cir. 2005) (explaining there is "no disparate treatment under the ADEA when an employer acts on the basis of other facts that are only empirically correlated with age, such as pension status, seniority, or wage rate"); *Gantt v. Wilson Sporting Goods,* 143 F.3d 1042, 1048 (6th Cir. 1998) (same). "An employer may not use any of these factors as a proxy for age, but age itself must be the motivating factor behind the employment action in order to constitute an ADEA violation." *Allen v. Diebold, Inc.*, 33 F.3d 674, 676 (6th Cir. 1994) (citing *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 611 (1993)). Thus, even if AstraZeneca terminated Plaintiff's employment due to the fact that she was a high wage earner (which it did not), this fact would not support an inference of age discrimination.

Second, it is well-settled that it is not within the province of the courts to "act as super personnel departments to second guess an employer's facially legitimate business decisions." *Lee v. City of Columbus*, 636 F.3d 245, 257-258 (6th Cir. 2011) (quoting *Adams v. Tenn. Dep't of Fin. And Admin.*, 179 F. App'x 266, 272 (6th Cir. 2006)). See also *Aday v. Westfield Ins. Co*., 2022

15

U.S. App. LEXIS 2319, at * 15 (6th Cir. 2022); *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 628 (6th Cir. 2006).

"If an employer has an 'honest belief' in a nondiscriminatory basis upon which it has made its employment decision, . . . then the employee will not be able to establish pretext." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530-31 (6th Cir. 2012). To invoke the honest belief rule,[6] "an employer's pre-termination investigation need not be perfect," rather the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action. *Loyd v. St. Joseph Mercy Oakland*, 766 F.3d 580, 590-91 (6th Cir. 2014). Courts routinely hold that a belief based on particularized facts derived from investigations overcomes claims of pretext. *See, e.g., Romans v. Mich. Dep't of Hum. Svcs.*, 668 F.3d 826, 839 (6th Cir. 2012); *Owhor v. St. John Health-Providence Hosp.*, 503 F. App'x 307, 311 (6th Cir. 2012); *Wright v. Murray Guard Inc.*, 455 F.3d 702, 708 (6th Cir. 2006); *Sublett v. Masonic Homes of Ky.*, 2022 WL 2798998, at *5 (6th Cir. July 2022).

AstraZeneca's investigation was beyond reproach and certainly supports the decision to terminate Plaintiff's employment. That AstraZeneca's experienced investigators determined that Plaintiff did not tell the truth during the investigation and believed Page in no way demonstrates bias against Plaintiff due to her age. Indeed, the investigators involved in these matters do not have knowledge of either Plaintiff's age or that of Page. Pomponi Decl. ¶ 38. AstraZeneca honestly believed that Plaintiff obtained BCISE samples and Plaintiff cannot show otherwise.

---

[6] The Court need not address the honest belief rule to reject Plaintiff's assertions of pretext. The honest belief rule becomes relevant only if the plaintiff shows that the defendant's "proffered reason was a mistake, foolish, trivial, or baseless." *Gumm v. AK Steel Corp.*, 2023 U.S. Dist. LEXIS 171733, *26 (E.D.Mich. 2023) (citing *Hendershott v. St. Luke's Hosp.,* 2020 U.S. App. LEXIS 27028, 2020 WL 6256869, at *2 (6th Cir. Aug. 25, 2020) (citing Loyd, 766 F.3d at 590-91)). Here, Plaintiff cannot not show that AstraZeneca's proffered reason for terminating her employment—that she obtained BCISE samples in violation of AstraZeneca policy—was a mistake, foolish, trivial, or baseless.

Notably, Plaintiff testified that no one at AstraZeneca, including Bellefeuille[7] ever said anything negative about her age. Pl. Dep. p. 175. Rather, during her deposition, Plaintiff testified that during a town hall meeting with dozens of people approximately one year to 15 months prior to her termination, AstraZeneca's head of sales said something to the effect of the company needing "fresh blood," which Plaintiff interpreted to mean the sales force was too old. Pl. Dep. pp. 166-68. However, this individual did not play any role in the decision to terminate Plaintiff's employment. Pl. Dep. p. 176; *see Hopkins v. Electronic Data Systems Corp.,* 196 F.3d 655, 661 (6th Cir. 1999) (stating stray remarks not related to the decision-making process are not evidence of unlawful discrimination). This is a classic stray remark that does not in any way demonstrate pretext. *See Crook v. Simpson Strong-Tie Co.,* 2012 U.S. Dist. LEXIS 4833, at * 65-66 (M.D. Tenn. 2011) (finding that stray remarks by a non-decision maker do not support an inference of discrimination).

Plaintiff bears the burden of not only showing that AstraZeneca's stated reason for her termination—obtaining BCISE samples for personal use—was not the real reason, but also that the real reason was her age. There is simply no evidence to support this claim; as such, AstraZeneca is entitled to summary judgment on Plaintiff's age discrimination claims.

**B. Plaintiff's TPPA Claim Fails as a Matter of Law**

The TPPA provides that "no employee shall be discharged or terminated ***solely*** for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(b) (emphasis added). The term "illegal activities" encompasses "activities that are in violation of the . . . civil code of . . . the United States or any regulation intended to protect the public health, safety or welfare." Tenn. Code Ann. § 50-1-304(a)(3).

---

[7] Bellefeuille is in his 50s. It defies credulity that an individual who is a member of a protected class would discriminate against another member of the same class based on membership in that class.

To prevail on a TPPA claim, a plaintiff must prove that: (1) she was an employee of the defendant; (2) she refused to remain silent about violations of the law; (3) she was discharged; and (4) the **sole** reason for her discharge was her reporting the illegal activities. *Haynes v. Formac Stables, Inc.*, 463 S.W.3d 34, 37 (Tenn. 2015) (citations omitted); *Henderson v. Corr. Corp. of Am.*, 918 F. Supp. 204, 209 (E.D. Tenn. 1996) (emphasis added). Plaintiff cannot demonstrate that her reporting of illegal activities played **any** role in her termination, let alone was the **sole** reason for her discharge.

As discussed at length above, the detailed HR and Compliance Reports demonstrate that AstraZeneca terminated Plaintiff's employment after irrefutable evidence proved that Plaintiff asked her direct reports to take BCISE samples for her contrary to Company policies, coupled with the substantiated HR violations. In her Amended Complaint, Plaintiff herself lists the reasons for which AstraZeneca purportedly terminated her employment—that there are reasons for her termination other than her alleged whistleblower activity is fatal to her TPPA claim. That Plaintiff has alleged that both her age and her whistleblower activity were reasons for her termination further dooms this claim.[8]

Plaintiff admits that no one made any negative remarks regarding her reporting of Page, nor has she ever been discouraged from making any such reports. To the contrary, Plaintiff testified that Bellefeuille encouraged her to report information regarding Page to AstraZeneca. Pl. Dep. p. 81. When asked why she believed that there was a retaliation element to her termination, Plaintiff testified that "none of this started until after [I filed the claim against Jennifer]." Pl. Dep. p. 177. Plaintiff admitted that she did not think anyone else other than Page retaliated against her,

---

[8] It is axiomatic that one cannot maintain two sole-cause claims in a single lawsuit—Plaintiff cannot show that she was terminated solely due to her "refusal to remain silent" and "because of" her age. As far as her retaliation claim, Plaintiff testified that her termination was "more retaliation than age probably." Pl. Dep. at 178.

but then stated that because Page does not have the power to fire anybody, she would have to say AstraZeneca retaliated against her solely based on the sequence of events. Pl. Dep. p. 177.

It is well-settled that the mere sequence of events does not demonstrate a causal connection in a retaliation claim. *See, e.g., Abbott v. Federal Forge, Inc.*, 912 F.2d 867, 875 (6th Cir. 1990) (noting that "*post hoc, ergo propter hoc*[9] is not a rule of legal causation" in holding that plaintiffs failed to establish connection between employer's hiring practice and disparate impact on older applicants); *Latosky v. Morrison-Knudsen Corp.*, 1996 U.S. App. LEXIS 32709, No. 95-4176, 1996 WL 708346, at *3 (6th Cir. 1996) (holding that "the mere fact that adverse employment actions occurred after plaintiff engaged in protected activity is insufficient to support an inference of retaliation" and citing *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986)). "*Post hoc ergo propter hoc* is not enough to support a finding of retaliation--if it were, every employee would file a charge just to get a little unemployment insurance. Timing may be an important clue to causation, but does not eliminate the need to show causation--and [the plaintiff] really has nothing but the *post hoc ergo propter hoc* 'argument' to stand on." *Bermudez v. TRC Holdings, Inc.*, 138 F.3d 1176, 1179 (7th Cir. 1998) (citation omitted).

Plaintiff has nothing to connect her termination to her complaint regarding Page other than the fact that AstraZeneca's investigation into her grew out of the Page investigation. It is not uncommon for additional reports of misconduct to arise during an investigation, which is precisely what happened in the present matter. AstraZeneca investigates all allegations of impropriety and violation of policy, regardless of how AstraZeneca becomes aware of these claims. *See* Davis Dep. p. 47. It defies credulity to suggest that AstraZeneca should not have investigated Page's allegations regarding Plaintiff merely because Page reported them during the investigation into

---

[9] Post hoc ergo propter hoc translates to "after which, therefore because of which".

19

her. Page's motivation for reporting Plaintiff is inapposite and in no way demonstrates a retaliatory motive on the part of AstraZeneca. *Id.* As the sequence of events is the sole basis for Plaintiff's claim of violation of the TPPA, Plaintiff cannot show a causal connection between her termination and her report regarding Page. Therefore, she cannot state a claim under the TPPA, and AstraZeneca is entitled to judgment as a matter of law.

## **CONCLUSION**

Plaintiff was not terminated because of her age or because she reported alleged illegal activity involving Jennifer Page. Rather, Plaintiff was terminated because AstraZeneca determined that she obtained samples of BCISE for her personal use in violation of Company policy. Plaintiff cannot point to a shred of evidence supporting her claims. As such, AstraZeneca respectfully requests that the Court grant its Motion for Summary Judgment and dismiss Plaintiff's Amended Complaint in its entirety.

Respectfully submitted,

*/s/ Jennifer S. Rusie*
Jennifer S. Rusie, BPR No. 026009
**JACKSON LEWIS, P.C.**
611 Commerce Street, Suite 2803
Nashville, TN 37203
Telephone: (615) 565-1664
Email: jennifer.rusie@jacksonlewis.com

*Counsel for Defendant*

20

**CERTIFICATE OF SERVICE**

I hereby certify that on October 23, 2023, the foregoing was served upon the following via

the Court's ECF system:

Rebecca W. Demaree
Peter C. Robison
CORNELIUS & COLLINS, LLP
211 Athens Way, Suite 200
Nashville, TN 37228
rwdemaree@cclawtn.com
pcrobison@cclawtn.com

*Attorneys for Plaintiff*

*/s/ Jennifer S. Rusie*
Jennifer S. Rusie

4888-7446-5674, v. 1

21